JONATHAN M. GORDON (State Bar No. 82202)
**ALSTON & BIRD LLP**
333 South Hope Street
Sixteenth Floor
Los Angeles, California 90071
Telephone: (213) 576-1000
Facsimile: (213) 576-1100
E-mail: jonathan.gordon@alston.com

STEPHEN WALD (*pro hac vice pending*)
LAUREN J. COPPOLA (*pro hac vice pending*)
**PARTRIDGE SNOW & HAHN LLP**
30 Federal Street
Boston, Massachusetts 02110
Telephone: (617) 292-7900
Facsimile: (617) 292-7910
E-mail: swald@psh.com
          lcoppola@psh.com

Attorneys for Plaintiff
FREE CONFERENCING CORPORATION

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FREE CONFERENCING CORPORATION, a Nevada corporation,<br><br>       Plaintiff,<br><br>       v.<br><br>COMCAST CORPORATION, a Pennsylvania corporation,<br><br>       and<br><br>JOHN DOES 1-10,<br><br>       Defendants. | Case No.:<br><br>**COMPLAINT:**<br><br>**1. DECLARATORY JUDGMENT – COMMON CARRIER;**<br><br>**2. COMMUNICATIONS ACT;**<br><br>**3. FRAUD;**<br><br>**4. AIDING AND ABETTING FRAUD;**<br><br>**5. DECLARATORY JUDGMENT – VIOLATIONS OF COMMUNICATIONS ACT;**<br><br>**6. INTENTIONAL INTERFERENCE WITH CONTRACT AND PROSPECTIVE ECONOMIC RELATIONS;**<br><br>**7. UNFAIR AND UNLAWFUL COMPETITION UNDER BUSINESS & PROFESSIONS CODE §17200;**<br><br>**[DEMAND FOR JURY TRIAL]** |

## THE PARTIES

1.     Plaintiff Free Conferencing Corporation ("Free Conferencing") is a Nevada corporation with a principal place of business in Long Beach, California.

2.     Defendant Comcast Corporation. ("Comcast") is a Pennsylvania corporation with a principal place of business in Philadelphia, Pennsylvania.

3.     Defendants John Does 1-10 are one or more unidentified telecommunications carriers or service providers that transmit calls for or on behalf of Comcast and its customers and who fail to comply with laws requiring the transmission of accurate calling party numbers for calls originated from Comcast customers ("John Does Defendants"). The true identities of the John Doe Defendants are not yet known but will be ascertainable through discovery.

## JURISDICTION AND VENUE

4.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 47 U.S.C. §§ 206 and 207.  This case arises under federal statutory and common law and relates to rights identified by federal statute, specifically 47 U.S.C. §§ 201, 202, 203, 206, 207, and 227.  The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000, exclusive of interests and costs, and is between citizens of different states.  This Court also has supplemental jurisdiction over the pendant state law claims under 28 U.S.C. § 1367. Free Conferencing's claims for declaratory relief are cognizable under 28 U.S.C. §§ 2201 and 2202.

5.     Venue is proper pursuant to 28 U.S.C. 1391(b)(2), because this is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

6.     The Court has personal jurisdiction over Comcast because it does business in the State of California, with numerous retail locations, network equipment, and other business operations in the state.

# FACTS COMMON TO ALL COUNTS

## The Parties' Businesses

7.     Free Conferencing is a leading provider of collaborative communications solutions serving a wide range of businesses, individuals, communities, and organizations around the world.  More than 5 million registered users and upwards of 30 million people a month use Free Conferencing conference call services.  Free Conferencing's flagship product is FreeConferenceCall.com, a reliable, cost-effective, reservation-less and easy-to-use audio conferencing service.

8.     Free Conferencing's business focuses on providing conference calling services without charging organizer fees to the party hosting the calls.  Under its business model, local phone companies known as local exchange carriers ("LECs") are willing to pay Free Conferencing, as well as other subscribers whose services generate a relatively high volume of telephone traffic, to direct some traffic to the LECs' locations.

9.     Free Conferencing's success and growth has come from the high quality and reliability of its services and the introduction of new users to its services when they participate in conferences invited by existing users.  Free Conferencing's users include individuals, Fortune 500 companies, the Congress of the United States, Homeland Security, colleges and universities, religious institutions, and small businesses throughout the U.S.  Free Conferencing also provides conferencing services to residents and businesses in more than 50 countries.

10.     Comcast provides cable television, broadband, and phone services throughout the United States.  Its phone service is based on voice over the Internet protocol, more commonly known as "VoIP" or "interconnected VoIP technology."  Comcast provides local and long distance phone service to over 11 million households in California and throughout the United States.

11.     The Federal Communications Commission ("FCC") has adopted a number of regulations applicable to providers of VoIP services such as Comcast.  An

FCC goal has been to facilitate the deployment of and transition to all IP networks. Comcast acts as and behaves like a "common carrier" under the Communications Act of 1934, as amended, 47 U.S.C. § 151 *et seq.* (the "Act").  The telephone service that Comcast provides to its customers is the functional equivalent of the service provided by traditional phone companies, including companies that the FCC has made clear are common carriers under the Act.

12.   Comcast recognizes that whether it is classified as a carrier under the Act is important because telecommunications services are still regulated more pervasively than "information services."  According to its 2015 Annual Report, Comcast has arranged for interconnection rights to transmit phone traffic through what its annual report refers to as its "affiliated CLECs," but it recognizes that the "regulatory environment for its voice services remains uncertain."  (A "CLEC" is a competitive local exchange carrier created to open competition for local phone service by an amendments to the Act in 1996.)  In short, Comcast recognizes it may be a common carrier under the Act, with all of the obligations of a common carrier.

13.   On information and belief, Comcast selects its routers and transit service providers according to who can provide the lowest price, and it has expressed a lack of concern for call quality.  On information and belief, Comcast knows or should know that those service providers are offering their services at a below market price.  On information and belief, Comcast also knows or should know that such CLECs and service providers could not so undercharge other carriers and vendors without ignoring regulatory and operating requirements imposed on the rest of the industry

**Regulatory Background**

14.   Historically, telephone service in the United States was largely provided by a single, integrated company, known as AT&T.  In 1984, AT&T was split into "local" and "long distance" or interexchange companies ("IXCs"). The local telephone companies, known as local exchange carriers or "LECs", maintain franchises to provide telephone service within defined geographic service territories. IXCs

generally utilize their own lines to carry calls across a state or across the country. They do not, however, own local telephone lines, which are owned by the LECs. To enable long distance competition, the FCC requires LECs to allow IXCs to use their local network for purposes of "originating" and "terminating" telephone calls. For example, when a consumer makes a long distance call, the consumer's LEC "originates" the call and hands it off to the IXC, which transmits the call across its network (or utilizes the network(s) of other intermediate transit providers) to the LEC of the called party, which then "terminates" the call to the dialed customer.

15.     To compensate LECs for use of their networks, the FCC requires IXCs to pay "access charges" for "originating" and "terminating" long distance telephone calls.

16.     The most fundamental goal of the U.S. telecommunications network is to complete calls.  Under federal and state communication laws and regulations, carriers have a legal obligation to make adequate arrangements to ensure that calls by their customers/subscribers are completed reliably.  The FCC has ordered that, under Act, it is unlawful for any provider of telecommunications services that knows or should know that it is providing degraded service to certain areas to fail to correct the problem or to fail to insure that entitles through which it transmits traffic are performing adequately.  *In the Matter Of Developing Unified Intercarrier Compensation Regime,*  27 F.C.C. Rcd. 1351, 55 Communications Reg. (P&F) 400, 2012 WL 387736 (F.C.C.).

17.     In today's telecommunications industry, accurate data related to the origin of calls, generally referred to as call signaling information, is a legal requirement and essential component to the continuity and reliability of communications in the United States, and the world.  Call signaling information includes the originating phone number (called the "calling party number"), electronic information for "automatic number identification" ("ANI") making caller-ID possible, and other meta-data.  A single long-distance call will generally cross the networks of not less than three separate telecommunications carriers, but may pass through many more networks before reaching its final destination.  Often times a call will be transmitted over

congested lines causing the call to fail.  Often a call transmitted using VoIP technology (which is the most pervasive method of call transport today) will experience packet loss resulting in poor call quality and call failure, especially when there are multiple intermediate transit companies used to transmit a call.  If a call with accurate call signaling information fails, the call "flashes back" to the originator of the call by way of that call signaling information.  When a call with inaccurate call signaling information fails, the call cannot flash back resulting in problems for consumers, businesses, law enforcement, and generally speaking diminishes the effectiveness and reliability of vital communications services.

18.     Sometimes, and for various nefarious reasons, a transit provider will intentionally strip, alter, or otherwise manipulate the identification of the originating phone number of the call.  One example that is a primary concern of Plaintiff, and as alleged in this Complaint, involves the use of thousands of SIM cards placed in a mechanism known as a "SIM Box."  A SIM Box uses thousands of prepaid calling cards in conjunction with modems and antennas and makes calls continuously. SIM Boxes are known to create call delay, echoes, and noise on the line which cause people to make shorter duration calls, and more calls fail because the prepaid balance on the SIM card runs out.  SIM cards are available at a very low cost because the providers of these cards assume buyers will use them intermittently, not continuously. When thousands of SIM cards are placed into a SIM Box and used to route calls, the calls are actually re-originated with an "anonymous" or "spoofed" number, which breaks the chain of accurate call identification information.  Fraudulent operators abusing SIM Boxes can undercut the market price for legitimate call transit routes. They offer below market routes to other transit providers who in turn offer the lower cost routes to call originators such as Comcast.  Such operators will often blend these SIM card calls with legitimately routed calls in order to disguise fraud.  It is possible that traffic originators such as Comcast, in the beginning, might be unaware that they are using unscrupulous transit providers to deliver their traffic for call termination.

However, it is a relatively straightforward process for a technologically sophisticated enterprise like Comcast to test for call quality and the accurate transmission of call identification information, and once alerted to the fact that the calls that they are routing are having quality and completion issues, it becomes the responsibility of the call originator, like Comcast here, to ensure that its customers' calls are routed with accurate information and terminated to the receiving party.

19.    Inaccurate call signaling information, the intentional use of misidentified originating telephone numbers, and other gamesmanship regarding caller identification have serious harmful consequences.  Law enforcement agencies rely on accurate caller identification information in their work. As recently as May 2015, a local exchange carrier that terminates calls for Free Conferencing was unable to respond to an emergency request from a major metropolitan police force investigating a terrorist threat because the originating numbers transmitted with the call data had been altered, apparently by a router used by Comcast.

20.    The accuracy of caller identification information is so important that the issue has been addressed by Congress and the FCC multiple times to enforce the illegality of various methods and purposes use to falsify caller identification information.  Congress addressed the issue in 2009 with the enactment of the Truth In Caller ID Act, 47 U.S.C. § 227(e).  Under that statue, it is unlawful "in connection with any telecommunications service or IP-enabled voice service, to cause any caller identification service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value."

21.    In 2011, in a proceeding known as the *In the Matter Of The Connect America Fund*, the FCC issued an order addressing a variety of issues related to intercarrier compensation, new telecommunications technology, and other matters affecting the industry (the "CAF Order").  *In re Connect America Fund, Report and Order*, 26 FCC Rcd. 17663, 17890-904, ¶¶ 702-35 (2011) ("CAF Order").  One of the

subjects of the CAF Order is "Phantom Traffic," a term used to identify the practice whereby signaling and calling party information is altered, manipulated, or otherwise lacks appropriate identifying information.

22.    In the CAF Order, the FCC found that "gamesmanship with regard to calling party information is rife" and took measures to stop the practice.  The FCC is so concerned about the problems associated with altering and manipulating caller identification information that it ordered that its call signaling rules applied to any telephone traffic sent to the public switched telephone network, including calls that originated in VoIP.  *Id.*, ¶717-18.

23.    The FCC amended its "rules to address 'phantom traffic' by ensuring that terminating service providers receive sufficient information to [among other reasons] bill for telecommunications traffic sent to their networks…."  CAF Order, ¶ 702. The FCC also made it clear that altering any of the calling party's information was unlawful:

> In the [Notice of Proposed Rulemaking], we also sought comment on a proposed rule that would prohibit service providers from altering or stripping relevant call information. More specifically, we proposed to require all telecommunications providers and entities providing interconnected VoIP service to pass the calling party's telephone number (or, if different, the financially responsible party's number), unaltered, to subsequent carriers in the call path. Commenters overwhelmingly supported this proposal. We believe that a prohibition on stripping or altering information in the call signaling stream serves the public interest. The prohibition should help ensure that the signaling information required by our rules reaches terminating carriers. Therefore, we adopt our proposal to prohibit stripping or altering call signaling information with the modifications discussed below.

*Id.*, ¶ 719.  Pursuant to its authority to interpret and apply, *inter alia*, 47 U.S.C. § 201, the FCC adopted new regulations preventing long distance carriers and VoIP service providers from stripping or altering call signaling information.  47 C.F.R. § 64.1601.

24.    Not only does the FCC prohibit call signaling information from being manipulated or altered in any way, it also affirmatively requires certain information, including the calling party's phone number, be included in the signaling information. In the CAF Order, the FCC expanded its rules to, *inter alia*, apply them both to all

intrastate traffic and to the non-traditional phone companies like Comcast who provide interconnection VoIP service.

### Defendants' Wrongful Conduct

25.     Free Conferencing's business and service to customers rely on compliance by Comcast and the John Doe Defendants with the laws and regulations governing telecommunications, including intercarrier compensation, phantom traffic, and the legal requirements to provide accurate signaling information and originating number information unaltered to subsequent carriers in the call path.  Even though Comcast has been alerted to the improper activity surrounding its call routing, Comcast continues to knowingly use call routers that have shown little interest in ensuring that calls are completed and completed with accurate caller identification information; Comcast subscribers who use Free Conferencing's service continue to experience issues with call completion and call quality.  In contrast, other originators who have been likewise alerted to the same problems have addressed and put a stop to the problems.

26.     Free Conferencing regularly receives demands for information from law enforcement, and has four six-inch notebooks of subpoena information from Department of Homeland Security, Department of Justice, FBI, police and other law enforcement agencies who are hampered in their ability to follow-up on terrorist and other threats to national security and the public at large when call signaling and caller identification information are altered or manipulated.

27.     Also, many Comcast customers are unable to complete their calls because the third-party transit service providers used by Comcast do not care about the quality of the route they use to transmit traffic.  When a call fails due to congested lines or for some other reason, the calls cannot flash back to Comcast because the call signaling information has been changed.  Consequently, the calls simply fail, resulting in violations of laws relating to call completion.

28.     Also of concern is that consumers often cannot complete their calls and

are misinformed of the reason why.  This results in direct damage to the Free Conferencing service and reputation, but this is also a threat to the reliability of the United States telecommunications system.

29.     Approximately 80% of Free Conferencing's business is the result of the viral effect of word-of-mouth recommendations to use the service and from the positive experience of conference call participants invited to calls by registered users of the service.  One lost customer, especially when due to a negative consumer experience, has a negative exponential viral effect.  As Free Conferencing receives a marketing fee from LECs who terminate calls to its conferences, if those LECs cannot bill for terminating access for those calls, or if fewer calls are placed due to lost customers, then Free Conferencing cannot receive the fees to which it is entitled for those calls.

30.     In addition, as part of its conferencing service, Free Conferencing provides its customers with call detail reports relating to the conference calls they join through Comcast's phone service.  Those reports include information on the participants of the conference, which come from caller ID data more technically known as "automatic number identification" ("ANI").  This information shows up as "spoofed" with an entirely different number that is unrecognizable to the user of the service.  When Comcast, or the CLECs or transit providers with which it does business, do not comply with their legal obligations to ensure that the caller identification information is transmitted accurately and unaltered, Free Conferencing cannot provide accurate call information to its customers which often results in customer confusion, dissatisfaction, and a loss of trust in the service and in Free Conference Call as a company.  This illegal practice damages both the revenues of Free Conference Call and the brand.  The responsibility for the integrity of the call information ultimately rests with the originator of the call, Comcast, especially once Comcast becomes aware that caller identification information and other call signaling information for Comcast's customers' calls, in Comcast's call path, is being altered.

31.     Free Conferencing relies on Comcast for accurate call identification information.  The altering and manipulation of the call signaling information by Comcast's third party contractors makes the call detail reports provided by Free Conferencing to its individual and corporate clients inaccurate, resulting in customer complaints and destruction of Free Conferencing's reputation as a dependable, reputable, and conscientious service provider.

32.     Free Conference has conducted regular testing of calls originated through Comcast's voice service.  As a result of that testing, it has determined that significant amounts of calls originated through Comcast to Free Conferencing conferences are either failing or show up with a manipulated ANI (a "spoofed" number).  Free Conferencing has data that show the time, date, and other information identifying specific calls originated from Comcast's network.  That data includes the inaccurate calling party numbers for calls terminated at Free Conferencing's conferencing bridges.  Each specific call transmitted with fraudulent signaling information and calling party numbers can be identified with particularity, but the data is too large to list in this Complaint.

33.     One of the ways that Free Conferencing knows that SIM card fraud is involved is that when terminated calls originated by Comcast contain signaling information showing that the originating caller information has been changed to reflect that the call was originated by T-Mobile. Free Conferencing has verified the problem with T-Mobile and its affiliated SIM card provider and has communicated this information to Comcast.  T-Mobile has expressed its concern about the problem because this fraud by routers used by Comcast takes place at a tremendous cost to T-Mobile.  Comcast has shown little regard for the problem, and is protecting the identity of its call transit providers and allowing the problem ~~to~~ not only to persist but to grow.

34.     By letter dated April 6, 2015, Free Conferencing requested that Comcast cease and desist from using third-party transit service providers who engage in the

alteration and manipulation of caller identification and call signaling information. Comcast responded to the letter with a request for information from Free Conferencing even though Comcast is in the ideal position to identify the culprits, as Comcast knows to whom it passes its voice traffic and can easily conduct tests to identify quality issues and the manipulation and altering of call signaling information. Free Conferencing thus informed Comcast that it should be conducting its own tests and identifying the problem transit providers with which it does business so that Free Conferencing can take action to stop the illegal conduct.

35.     In response, Comcast requested that certain members of its senior management talk to Free Conferencing.  A telephone conference was arranged. However, during that conference, Comcast denied that a problem exists.  This denial was particularly peculiar, or simply disingenuous, because Free Conferencing supplied Comcast with a number to test the Comcast routes, and call detail records reflect that Comcast tested those routes while on the telephone with Free Conferencing.  Comcast also refused to discuss any plan by which it would comply with its legal obligations to ensure that calling party information from calls originated by its customers not be stripped or altered.

36.     Despite repeated requests, Comcast has refused to identify the CLECs and transit providers with which it contracts to originate and terminate traffic.  On information and belief, Comcast selects such providers, at least with respect to connecting calls to the CLECs that terminate calls to Free Conferencing conferences, solely on the basis of price while willfully disregarding its obligation to ensure that calling party information from calls originated by its customers not be stripped or altered.  Moreover, since at least the receipt of Free Conferencing's cease and desist letter dated April 6, 2015, Comcast has been aware that providers it uses to terminate traffic to Free Conferencing conferences are stripping or altering calling party information in violation of the law and, despite that knowledge, Comcast has failed and refused to address the situation as required by the CAF Order, the Act, and

applicable regulations.

## COUNT I

### (Declaratory Judgment – Comcast As "Carrier" Under Act)

37.     Free Conferencing incorporates by reference the allegations in Paragraph 1 to 36 as if fully set forth herein.

38.     A present, an actionable and justiciable controversy exists with respect to whether Comcast is a common carrier within the Act and the 1996 Act.  If Comcast is a common carrier, Free Conferencing may recover damages for violations of the Act pursuant to 47 U.S.C. § 206, 207.  As alleged below, Comcast has violated 47 U.S.C. §§ 201, 227, the CAF Order, and regulations promulgated thereunder.

39.     47 C.F.R. §21.2 defines "Communications Common Carrier" as "any person engaged in rendering communication service for hire to the public."

40.     Comcast is a common carrier.  According to its annual report filed February 27, 2015, Comcast offers to the public "voice service plans using an interconnected Voice over Internet Protocol ("VoIP") technology. Our plans provide either usage-based or unlimited local and domestic long-distance calling and include options for international calling plans, voicemail, voicemail transcriptions, text messaging, caller ID and call waiting. For customers with our high-speed Internet services, our voice services also include the ability to access and manage voicemail, text messaging and other account features through our XFINITY online portal or our mobile apps."

41.     According to its 2015 Annual Report, Comcast serves 11.2 million voice customers.

42.     On information and belief, absent a declaratory judgment that Comcast is a carrier subject to claims under §§ 206 and 207, and thus liable for damages arising from violations of the Act, Defendants will continue to transmit calls with manipulated and altered call signaling information.

43.     Accordingly, Free Conferencing is entitled to a declaratory judgment and

1  such further relief based upon that declaratory judgment as the Court deems proper,

2  pursuant to 28 U.S.C. §§ 2201 and 2202, determining that Comcast is a common

3  carrier subject to regulation under the Act and suit sunder 47 U.S.C. § 206, 207.

### COUNT II

### (Violation of Section 201, 202 of the Communications Act)

6  44.    Free Conferencing incorporates by reference the allegations in Paragraph

7  1 to 43 as if fully set forth herein.

8  45.    Section 201(b) of the Act, 47 U.S.C. § 201, imposes upon common

9  carriers the duty to ensure that their practices are "just and reasonable," and provides

10  that all unjust and unreasonable practices are unlawful.

11  46.    Section 202 under the Act makes it unlawful for any common carrier to

12  make any unjust or unreasonable discrimination in charges, practices, classifications,

13  regulations, facilities, or services for or in connection with like communication

14  service, directly or indirectly.

15  47.    Comcast and/or the John Doe Defendant(s) have engaged in

16  unreasonable, unjustified, unlawful, and discriminatory altering and manipulating the

17  call signaling information and calling party numbers on calls being directed to Free

18  Conferencing conferences or by allowing telecommunications traffic with inaccurate

19  call signaling information to be transmitted.

20  48.    Modifying call signaling information to avoid paying the applicable

21  access charges constitutes an unreasonable practice in violation of Section 201(b) of

22  the Act and, directed against Free Conferencing, unlawful discrimination under

23  Section 202.

24  49.    As a result of Defendants' unreasonable and discriminatory practices,

25  Free Conferencing has been damaged in an amount to be established at trial.

26  50.    Because Defendants' conduct constitutes a violation of Section 201(b) of

27  the Act, Free Conferencing is also entitled to recover its reasonable attorneys' fees

28  pursuant to Section 206 of the Act, 47 U.S.C. § 206.

### COUNT III

### (Fraud)

51.     Free Conferencing incorporates by reference the allegations in Paragraph 1 to 50 as if fully set forth herein.

52.     The John Doe Defendants, with Comcast's actual knowledge at least since the cease and desist letter of April 6, 2015, altered or knowingly manipulated call signaling information on calls destined to Free Conferencing and provided that information to Free Conferencing via a transmission through the public switched telephone network.

53.     The John Doe Defendants transmitted that false and fraudulent information to Free Conferencing and intended that the LEC from whom Free Conferencing would be paid marketing fees for such calls would bill for terminating access charges based on the fraudulent CPNs, and thus Free Conferencing also relied on the false CPNs.

54.     It was reasonable for Free Conferencing to rely on the false signaling information CPNs in light of the FCC rules and regulations that prohibit altering and manipulation of CPNs.

55.     Free Conferencing has been harmed by the John Doe Defendants' fraudulent conduct in an amount that will be proven at trial.

56.     The John Doe Defendants are also guilty of oppression, fraud, or malice within the meaning of Civil Code § 3294 and are, in addition to actual damages, thus liable for punitive damages for the sake of example and by way of punishing them.

### COUNT IV

### (Aiding and Abetting)

57.     Free Conferencing incorporates by reference the allegations in Paragraph 1 to 55 as if fully set forth herein.

58.     To the extent that it may be determined that Comcast was not directly responsible for manipulating the call signaling, Comcast nevertheless permitted the

John Doe Defendants to act, using its network facilities to transmit the fraudulent traffic, while knowing or having reason to know that the John Doe Defendants were acting or would act tortiously. In addition, Comcast actively concealed the identity of the John Doe Defendants even after it had knowledge that they were altering CPNs in violation of applicable law and regulations.

59.     Comcast aided and abetted the fraud and tortious conduct perpetrated by the John Doe Defendants. Comcast knew that the conduct of the John Doe Defendants constitutes fraud and gave substantial assistance or encouragement to them to so act.

60.     Comcast is jointly and severally liable for all damages caused by the intentional tort of the John Doe Defendants that it aided and abetted.

## COUNT V

### (Declaratory Judgment – Violation of the Act)

61.     Free Conferencing incorporates by reference the allegations in Paragraph 1 to 60 as if fully set forth herein.

62.     A present, actionable and justiciable controversy exists with respect to the legal rights between the parties. Such controversy arises under the Federal Communications Act, 47 U.S.C. §§ 201, *et seq*., and under the laws of the United States.

63.     On information and belief, absent a declaratory judgment, Defendants will continue to transmit calls with altered and manipulated call signaling information, CPNs, and ANIs.

64.     It would be unduly burdensome and inefficient for Free Conferencing to bring new actions for damages each time Defendants wrongfully engage in such conduct.

65.     Accordingly, Free Conferencing is entitled to a declaratory judgment, and such further relief based upon that declaratory judgment as the Court deems proper, pursuant to 28 U.S.C. §§ 2201 and 2202, determining that:  (a) Defendants have engaged in unlawful call signaling manipulation in violation of §§ 201, 202, and

227 of the Act, the CAF Order, and 47 CFR 64.1601; (b) Defendants have damaged Free Conferencing; and (c) Defendants are prohibited from transmitting any traffic bound for Free Conferencing that does not fully comply with the FCC's call signaling rules, 47 CFR 64.1601.

### COUNT VI

#### (Intentional Interference With Contract And Prospective Economic Advantage)

66. Free Conferencing incorporates by reference the allegations in Paragraph 1 to 65 as if fully set forth herein.

67. Free Conferencing currently has millions of registered users who have signed up for its service and agreed to the "Terms and Conditions" pursuant to which they use the service ("Customer Agreements"). Under the Customer Agreements, Free Conferencing's millions of customers receive a dial-in number and an individual access code to allow them to make conference calls using Free Conferencing's conferencing bridges.

68. Defendants knew of the Customer Agreements. Defendants intended to disrupt the performance of the Customer Agreements by, *inter alia*, preventing large numbers of its customers from using Free Conferencing services. Defendants' conduct prevented full performance of the Customer Agreements or made performance more expensive or difficult.

69. Further, Free Conferencing has grown from nothing to over 25 million users a month by the satisfaction of customers with its services and the introduction to its services from, among other things, the participation of individuals in Free Conferencing conferences. Free Conferencing customers frequently invite non-customers to Free Conferencing conferences, and those introductions to Free Conferencing's services lead non-customers to Free Conferencing's website, where as many as 25% of new visitors sign up and become Free Conferencing customers and which results in approximately 80% of Free Conferencing's viral growth.

70. Defendants knew of the relationship between Free Conferencing, its

customers, and the users of its conferencing services, as well as the success and growth Free Conferencing has had in the market.

71.    Defendants intended to disrupt the relationship between Free Conferencing, on the one hand, and Free Conferencing's customers, users, and participants who would otherwise become registered users and regular customers on the other by, inter alia, failing to comply with their obligations under the Act, the CAF Order, and applicable regulations.

72.    Defendants engaged in wrongful conduct by violating §§ 201 and 227 of the Act, the CAF Order, and 47 CFR 64.1601.

73.    The relationship between Free Conferencing and its customers, users, and participants who would otherwise become registered users has been disrupted by Defendants' conduct described above.

74.    Free Conferencing has been harmed by Defendants' intentional interference with the Customer Agreements and with Free Conferencing's prospective economic relations with its users who would have become customers but for Defendants' unlawful and wrongful conduct.  Defendants' conduct was a substantial factor in causing that harm.

75.    Free Conferencing is entitled to recover from Defendants all damages proven at trial arising from Defendants' intentional interference with the Customer Agreements and with its prospective economic relations with its users who would have become customers but for Defendants' unlawful and wrongful conduct.

76.    Defendants are also guilty of oppression, fraud, or malice within the meaning of Civil Code § 3294 and is, in addition to actual damages, thus liable for punitive damages for the sake of example and by way of punishing it.

## COUNT VII

### (Unfair Methods of Competition, §17200)

77.    Free Conferencing incorporates by reference the allegations in Paragraph 1 to 76 as if fully set forth herein.

78.     Defendants have engaged in unfair competition within the meaning of California Business & Professions Code § 17200.  They have committed unlawful, unfair or fraudulent business acts or practices in the course of their business activities. They have knowingly transmitted fraudulent, false, misleading, altered, and manipulated call signaling information, CPNs, and ANIs in violation of §§ 201, 202, and 227 of the Act, the CAF Order, and 47 CFR 64.1601 with the intent to defraud, cause harm, or wrongfully obtain something of value from Free Conferencing.

79.     Defendants' unlawful, unfair or fraudulent business acts or practices have violated several common laws doctrines, including fraud/misrepresentation and interference with contractual relations.   Defendants' conduct, as discussed above, is also "unlawful" under Business & Professions Code § 17200 et seq. because Defendants violated §§ 201, 202, and 227 of the Act, the CAF Order, and 47 CFR 64.1601.

80.     Free Conferencing is entitled to preliminary and permanent injunctions enjoining Defendants, their officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with them, from any and all unfair, unlawful and fraudulent acts and practices in the course of their business activities, including, without limitation an order (a) any altering or manipulating any call signaling information or calling party information for any call originated by a Comcast customer and made to any Free Conferencing conference; (b) transmitting any traffic to the public switched telephone network with altered or manipulated calling party information or failing to transmit the telephone numbers received from or assigned to or otherwise associated with the calling party to the next provider in the path from the originating provider to the terminating provider; (c) failing to comply with prohibitions on phantom traffic and manipulation and altering of call signaling information in 227 of the Act, the CAF Order, and 47 CFR 64.1601; (d) blocking, choking, reducing, or restricting telephone traffic, including to avoid termination charges; and (e) failing to make appropriate use of CLECs to ensure calls of its

customers to Free Conference conferences terminate reliably.

**PRAYER FOR RELIEF**

WHEREFORE, Free Conferencing respectfully prays for judgment against the Defendants for the following relief:

(1)     Against all of the Defendants, jointly and severally, for all damages proved by Free Conferencing at trial, plus interest, and costs;

(2)     Against Comcast declaring and ordering that Comcast is a common carrier under the Communication Act of 1934, as amended, 47 U.S.C. § 151, *et seq*;

(3)     Against all of the Defendants declaring and ordering that (i) Defendants have engaged in unlawful call signaling manipulation in violation of §§ 201, 202, and 227 of the Act, the CAF Order, and 47 CFR 64.1601; (ii) Defendants have damaged Free Conferencing; and (iii) Defendants are prohibited from transmitting any traffic bound for Free Conferencing that does not fully comply with the FCC's call signaling rules, 47 CFR 64.1601.

(4)     Against all Defendants, jointly and severally, for Free Conferencing's reasonable attorneys' fees pursuant to 47 U.S.C. § 206 and other applicable provision of law;

(5)     Against all Defendants, jointly and severally, for punitive or exemplary damages to the extent provided by any applicable provision of law;

(6)     Against all Defendants, the entry of a preliminary and permanent injunction enjoining Defendants, their officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with them, from (a) any altering or manipulating any call signaling information or calling party information for any call originated by a Comcast customer and made to any Free Conferencing conference; (b) transmitting any traffic to the public switched telephone network with altered or manipulated calling party information or failing to transmit the telephone numbers received from or assigned to or otherwise associated with the calling party to the next provider in the path from the originating provider to the

terminating provider; (c) failing to comply with prohibitions on phantom traffic and manipulation and altering of call signaling information in 227 of the Act, the CAF Order, and 47 CFR 64.1601; (d) blocking, choking, reducing, or restricting telephone traffic, including to avoid termination charges; and (e) failing to make appropriate use of CLECs to ensure calls of its customers to Free Conference conferences terminate reliably.  and

(7)     Such further relief as the Court deems just and appropriate.

DATED:  May 29, 2015              Respectfully submitted,

                                 **ALSTON & BIRD LLP**


                                 /s/   Jonathan M. Gordon
                                 Jonathan M. Gordon
                                 333 South Hope Street
                                 Sixteenth Floor
                                 Los Angeles, California 90071
                                 Telephone:  (213) 576-1000
                                 Facsimile:   (213) 576-1100
                                 jonathan.gordon@alston.com


                                 **PARTRIDGE SNOW & HAHN LLP**
                                 Stephen Wald
                                 Lauren J. Coppola
                                 30 Federal Street
                                 Boston, Massachusetts 02110
                                 Telephone:  (617) 292-7900
                                 Facsimile:   (617) 292-7910
                                 swald@psh.com
                                 lcoppola@psh.com

                                 Attorneys for Plaintiff
                                 FREE CONFERENCING CORPORATION

1

## JURY TRIAL DEMAND

2          Free Conferencing Corporation demands a trial by jury on all claims so triable

3    pursuant to Fed. R. Civ. P. and L.R. 38-1.

4

5    DATED:  May 29, 2015          Respectfully submitted,

6                                 **ALSTON & BIRD LLP**

7

8                                  /s/   Jonathan M. Gordon

9                                 Jonathan M. Gordon
                                  333 South Hope Street
10                                Sixteenth Floor
                                  Los Angeles, California 90071
11                                Telephone:  (213) 576-1000
                                  Facsimile:   (213) 576-1100
12                                jonathan.gordon@alston.com

13                                **PARTRIDGE SNOW & HAHN LLP**
                                  Stephen Wald
14                                Lauren J. Coppola
                                  30 Federal Street
15                                Boston, Massachusetts 02110
                                  Telephone:  (617) 292-7900
16                                Facsimile:   (617) 292-7910
                                  swald@psh.com
17                                lcoppola@psh.com

18                                Attorneys for Plaintiff
                                  FREE CONFERENCING CORPORATION
19

20

21

22

23

24

25

26

27

28

COMPLAINT AND JURY DEMAND